EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED
STATES *v.* RUDOLPH WEIL.

[60 South. 133.]

1. INSURANCE. *Relief for fraud. Pleading. Contracts. What law Gov-
erns. Tontine policy. Relation between insurer and insured.*

Where fraud is relied on as a basis of relief sought from a chancery
court, the facts on which the charge of fraud is predicated must
be specifically stated, with full definiteness of detail. No general
averment of a fraudulent course of business, and no bare state-
ment of a corrupt design on the part of the defendant is sufficient.
The acts themselves which are claimed to be fraudulent must be
clearly set out.

2. INSURANCE. *Contracts. What law governs.*

In the interpretation of a tontine policy issued by a New York
Insurance Company, the decisions of the New York courts should
be followed.

3. LIFE INSURANCE.  *Tontine  policy.  Relations  between  insurer  and
     insured.*
  The relations between the insurer and the insured under a tontine
  policy are not of a fiduciary character and the insurance company
  in such case does not hold the accumulated profits as trustee for ·
  the policy holder.

APPEAL from the chancery court of Warren county.
HON. E. N. THOMAS, Chancellor.

Suit by Rudolph Weil against the Equitable Life
Assurance Society of the United States.    From a decree
overruling a demurrer to the bill, defendants appeal.

The facts are fully stated in the opinion of the court.

*Mayes & Longstreet,* for appellant.

The contract in question is a New York contract.
Naturally, therefore, we shall most fully, and primarily,
consider its effect in the light of the New York authori-
ties:

*Uhlman* v. *New York Life,* 109 N. Y. 421, was decided
in June, 1888, about four years before this contract was
made.    The Uhlman policy was on the ten year tontine
plan, with a provision for the equitable apportionment
amongst all policies in force at the expiration of the ten-
year period of all surplus and profits derived from lapsed
policies of the same class.    The court says:

"The plaintiff claimed that upon the mere proof of the
issuing of a policy such as was issued to him, and that it
had been kept alive during the ten-year period, and was
in full force at the time the dividend was payable, the
right arose to demand from the defendant a full and com-
plete accounting of the debit and credit items of what he
terms the tontine account, with a list of the members
entitled to participate therein, and also all the details
demanded in his prayer for judgment in the complaint.

· · ·

"He claims now to maintain the action and to have
the right to an accounting upon the ground:  1. That

the relation between the plaintiff and defendant is not one solely of contract, but that as to the participation in the profits of this tontine system, that relation is similar to one of trustee, and *cestui que* trust.   .   .   .   ·

"As to the first we are convinced, after a careful examination of the character of the relations existing between these parties, that it cannot be said that the defendant is in any sense a trustee of any particular fund for the plaintiff, or that it acts as to him and in relation to any such fund in a fiduciary capacity. It has been held that the holder of a policy of insurance even in a mutual company, was in no sense a partner of the corporation which issued the policy, and that the relation between the policy holder and the Company was one of contract, measured by the terms of the policy. See *Cohen* v. *N. Y. Mut. Life Ins. Co.,* 50 N. Y. 610; *People* v. *Security Life Ins. Co.,* 78 N. Y. 114."

See also on this point that the company is not a trustee for the assured, whether the policy be ordinary life or tontine, see the following additional authorities: *Everson* v. *Equitable Life,* 68 Fed. 258, affd. U. S. Cir. Ct. App., 71 Fed. 570; *Hunton* v. *Equitable Life,* 45 Fed. 661; *St. John* v. *American Mutual Life Ins. Co.,* 13 N. Y. 31; *Cohen* v. *Mutual Life Ins. Co.,* 50 N. Y. 610; *People* v. *Security Life Ins. Co.,* 78 N. Y. 114; *Taylor* v. *Charter Oak Life Ins. Co.,* 9 Daly, 489; affd. 8 Abb. N. C. 331; *Bewley* v. *Equitable Life,* 61 How. Pr. 344; *Buford* v. *Equitable Life,* 98 N. Y. Supp. 152; *Pierce* v. *Equitable Life,* 145 Mass. 56; *Greef* v. *Equitable Life,* 160 N. Y. 19.

In the case of *Equitable Life* v. *Brown,* 213 U. S. 25, this question was finally disposed of. The court there said, on page 44-45, that:

"We come, then, to a careful analysis of the other averments in the bill, and it is seen that it is largely founded upon the theory of the existence of a trust in favor of the policy holders, past and present, of the defendant as against the defendant, its officers and stock-

holders,. and it is asked that they, and each of them, be decreed to hold the funds and surplus as they may be ascertained, as trustees for such persons as shall be declared to have interests in such fund and surplus, under the decree of the court to be entered in the case. The complainant alleged that this so-called surplus of the defendant belongs entirely to the policy holders, after making certain deductions, and the defendant holds it, or at any rate a large portion of it, in trust for them, and that such is the proper construction of the charter and the policy; and he also avers that defendant has not distributed it from time to time to the policy holders, as intended by the charter and the policy. The various allegations in regard to waste, mismanagement, and improper investment and reinvestment of the funds of the defendant, and also the alleged fraudulent conduct of the officers guilty of such acts, do not show any inequitable or improper actual distribution of the fund as amongst the policy holders themselves. Although the effect of such conduct has plainly been to prevent the growth of the surplus to greater proportions than it has reached, there is still no averment anywhere in the bill that the amount of the surplus that was, in fact, distributed, was not fairly and equitably distributed to each of the policy holders, according to the amount of his policy, and in strict accordance with the rules and regulations theretofore adopted by the defendant for such distribution, which rules had been accepted by the complainant from time to time as such distribution was made. The fact, as alleged, that the amounts were paid to the complainant and accepted by him on the fraudulent representations of the officers that such amounts were all that were due, has no effect upon the question of the equitable and proper distribution of the fund that was, as a matter of fact, actually distributed. Nor does it give a cause of action of an equitable nature. These averments only show waste and misappropriation of the

moneys of the defendant before they ever reached the surplus fund, and before any distribution of it was made. In other words, they aver facts of mismanagement of the funds and wrongdoings by others, upon which a cause of action might arise against the officers and stockholders, or other persons guilty of such acts of wrongdoing and waste, in favor of the company itself. They lay no foundation for the jurisdiction of a court of equity in such a case, unless it appears that the relation between the policy holder and the defendant is that the latter is the trustee of the former by reason of the trust relation between them resulting from the insurance policy. The complainant's contention, as above stated, that there is such a trust in the fund mentioned, has never been regarded as the law in the state of New York" (citing New York cases) "nor anywhere else so far as any case has been cited on the subject."

The only case to the contrary of the position taken by appellant herein, so far as we have discovered, and the case on which apparently this bill is based, is the case of *Equitable Life* v. *Winn*, 126 S. W. 153, decided by the court of appeals of Kentucky on March 18, 1910, and after all of the decisions above cited. In that case the Kentucky court departed from and ignored the numerous well-considered cases in which it had been held that the trust relation did not exist. The court does not cite a single case in support of its holding; and did not answer a single opposing case except by its own *ipse dixit*. It should not be followed. It whistled down the wind the suggestion of the impracticability and objectionableness of the rule it declared, as to which the court of appeals of New York, in the Uhlman case, cited above, said this:

"Upon the theory of the plaintiff, every one of the policy holders of this class has a right of action such as this against the defendant to call it to an account, and to cause it to give in the trial of the action a detailed account of every transaction (proved by reference to or the pro-

duction of its books, and by the oaths of its officers) which took place from the commencement to the termination of the tontine period in regard to those matters material to be known upon the question of an equitable apportionment of the fund.    There would be no necessity for an allegation, much less the slightest, even *prima facie*, proof of wrongdoing, or that there had been any mistake made by the company in the apportionment made by it. But the mere fact that an individual was the owner of one of those policies in force at the. termination of the tontine period would give him a right of action and a right to demand this proof from the defendant.

"The mere statement of such a fact, it seems to us, is conclusive against the existence of any such right.    Of course it is not to be supposed that each individual policy holder would avail himself of this right, but the fact that each one might would place the company in the power of unscrupulous parties to take advantage of it for the purpose of endeavoring to levy contribution from it, which it might pay in order to secure freedom to itself from troublesome, expensive, unnecessary and wholly disingenuous investigations (and made in numerous suits) into the affairs of the company and its accounts running through many years.    That this should be permitted without an allegation, even on information and belief, that any fraud, mistake, or impropriety in the accounts, or in the manner of their statement, or in the result attained, had been made by the officers or agents of the company, would seem to be intolerable."

No demand at law or equity stated.    The bill bases its whole case on the allegation of a trust relation.    There is, however, a prayer for general relief; and since the chancellor took jurisdiction by overruling the demurrer, we conceive that our constitutional provision will necessitate a discussion of the question whether there is any cause of action stated.

The bill shows none such.    It is a bill of discovery; it contains no such prayer, and relieves defendant from

answering under oath. Apart from its pretense of a trusteeship, which has been disposed of above, it states no equity for an accounting in the case of complicated and mutual accounts, which a court of law cannot adequately handle.

Neither does the bill sufficiently allege fraud. As to that, it says only this:

"That thereupon the said defendant falsely and untruthfully represented to complainant that there was only due him the sum of $453.30; that in his reliance on said statement as true, complainant was misled and fraudulently induced to and did accept said sum in payment thereof, and this was done in ignorance of the true sum due to him, and under protest."

Here the allegation amounts to no more than this: That the company claims one right under the contract and complainant claims a different and greater right; and that the company stated the amount due complainant in accordance with its own claim of right. 9 Ency. of P. & Pr., p. 686, title "Fraud;" *Railroad Co.* v. *Neighbors,* 51 Miss. 412; *Richardson* v. *Davis,* 70 Miss. 225; *McInnin* v. *Mills,* 78 Miss. 56; *Weir* v. *Jones,* 84 Miss. 606.

*Brunini & Hirsch,* for appellee.

The appellant says that no trust relationship exists between the policy holder and the society. Nothing is before this court but the bill, policy, application and demurrer. There is no definition in any of these instruments, other than in the bill, to inform this court of the nature of the new free tontine return premium policy. The bill does, however, and we quote the definition therefrom:

"Complainant further shows that said contract, or tontine plan is a plan or arrangement whereby the defendant undertook to, and with this complainant and many others holding like or similar contracts in the nature

of, and acting as agent or trustee for complainant, and such other policy or contract holders, to collect, lend out, invest and distribute to such policy holders, including the complainant, such surplus accumulations as might remain to said contract or policy holders, after they had contributed from their annual payments their proper part of the death claims, reserve, losses and expenses incident to said contract, together with the earning which might be made thereon.''

With this definition alone before the court, and nothing to gainsay it, we respectfully, earnestly and confidently insist that the contract as defined in the bill must govern, and we submit, if we are correct in this, that the relationship of trust does exist. There is nothing in the allegations of the bill defining the contract which are inconsistent, or in conflict with the terms and provisions of the contract.

It is true as appellant has observed, and as we stated in the court below, that the case at bar was based on that of *Equitable Life* v. *Winn*, 126 S. W. (Ky.) 153. The court in that case says:

''A tontine contract of insurance is more than a policy of life insurance. In addition, it is an agreement on the part of the insurer to hold all the premiums collected on the policies forming that class for the specified period, which is called a tontine period, or period of distribution, and after paying death losses, expenses and other losses out of the fund so accumulated, to divide the remainder among those who are alive at the end of the tontine period, and who have maintained their policies in force. The premiums include a sum which at interest at $4\frac{1}{2}$ per cent compounded will, at the end of the expiration of the expectancy of the life of the insured, pay to his estate the principal sum insured, which is called the reserve of the policy. That is always provided for, and always collected in each life insurance premium. In addition another sum is included in the premium called

103 Miss.—13.

the 'mortuary fund' which pays the death losses of that
per cent which die before the expiration of their life
expectancies.   Their aggregate is the flat or level cost of
insurance.   Then there is added a sum to cover costs of
conducting the business, and for such losses as may occur
from other causes than death of policy holders.   This
'loading' of the premium is more or less arbitrary.   All
excess above cost, expenses, losses, death claims and the
reserve constitute what is known as the 'surplus' which
may also include sums realized from interest received upon
the reserves as a greater rate than that upon which it was
calculated, as well as from the death rate in a given year,
being less than the experience justified as certainly ex-
pected.   At any rate, this surplus is regarded as belong-
ing equitably to those policy holders who contribute it.
In tontine insurance, all who contribute agree that, in-
stead of apportioning it among them all, it may be
apportioned among those who outlive the period of dis-
tribution.   The insurer undertakes to handle the funds
for the parties.   Its pay is in the cost and expenses which
it charges as toll.   The balance not only belongs equitably
to those contributing to it, according to the terms of their
contracts, but the insurance company agrees to so appor-
tion it among them.   Now, why should it not keep its
contract.   To keep it faithfully and honestly, it is re-
quired to keep books of account, otherwise its apportion-
ment would be a mere guess, even if it rose to that dignity.
It is a trustee and agent of those for whom it has essayed
to act.   It will not be heard to say that it would be too
troublesome to keep the accounts, or would cost too
much to render the parties a true statement, or on that
account be impracticable to show to a court of chancery
in a suit for accounting the state of the books."

The case of *Ellinger* v. *Equitable Life*, 111 N. W. (Wis.)
567, is in point.   We quote from the decision:

"There is no question but what the plaintiff survived the completion of the tontine dividend period mentioned in the policy—March 10, 1904—nor that the policy was then still in force. Such being the facts, the contract expressly gave to the plaintiff an equitable and proportionate share of 'all surplus or profits derived from such policies on the semitontine plan' as should 'not be in force at the date of the completion of their respective tontine dividend periods.' That contract moreover, expressly gave to the plaintiff the choice of exercising 'either' of the four options therein prescribed. One was that the plaintiff might 'withdraw in cash this policy's entire share of . . . the accumulated reserve . . . and in addition thereto, the surplus apportioned by this society to this policy' The amount of the accumulated reserve is mentioned in the policy, but the surplus apportioned by the defendant to the policy is not mentioned, and there is no way for the plaintiff to ascertain the amount to which he was entitled March 10, 1904, except by information to be derived from the defendant. So the plaintiff could only ascertain the amount to which he was so entitled March 10, 1904, under the other options, by information to be derived from the defendant. A knowledge of the facts on the part of the plaintiff was essential to an intelligent exercise of the options thus secured by the contract. One of the objects of the lengthy examination of the plaintiff under section 4096, was, seemingly, to compel the plaintiff to elect which clause of the contract he would rely upon, while in ignorance of the facts. The plaintiff was not bound to accept the defendant's volunteered statements as to such amounts, but, for the purpose mentioned, had the right to an inspection of any books, papers or documents in the defendant's possession or under its control. Such reserve funds and surplus funds and profits are held by the defendant in trust for such policy holders, if any, as are entitled to the same, including the plaintiff. *Huber* v.

*Martin*, 127 Wis. 412, 105 N. W. 1031, 1135, 3 L. R. A. (N. S.) 653."

The principle announced in the *Chicago Mutual Life Indemnity Association* v. *Hunt*, 20 N. E. (Ill.) 55, is in point, although the appellant in that case was a mutual benefit association. We quote from the opinion:

"The failure of the officers of a mutual benefit association to keep correct and intelligent books of account, whether such failure results from design, carelessness, or want of skill, is a serious breach of official duty. Such officers are trustees, having funds intrusted to their care, to be safely and honestly kept and administered, not for their own benefit, but solely for the promotion of the laudable objects for which the association is organized. It is a duty of primary importance, incumbent on all trustees, to keep proper accounts of trust funds; for unless that is done the beneficial owners of such funds are subjected to constant uncertainty as to their rights, and to a constant liability to be defrauded. Next to the duty of honestly administering a trust fund is that of keeping a true, honest and intelligible account of such administration."

It is next contended by the appellant that the bill does not sufficiently allege fraud. It, however, quotes only a part of the bill on this subject. Appellant fails to quote in connection with the paragraph; it does quote the following:

"That complainant is informed and believes, and so charges the fact to be, that on the said 23rd day of January, 1907, upon the completion of said tontine period, the defendant, or such other agent or trustee, held for complainant as his proper proportion of the accumulated surplus, a sum in excess of twelve hundred and sixty-two dollars, though the exact amount thereof is unknown to complainant, and that complainant has no means of knowing the same."

The comment made by appellant on the question of fraud we submit is not warranted by the allegations of the

bill. The bill alleges that on the completion of the ton-tine period, the society held, as appellee's proper proportion of the accumulated surplus, a sum in excess of twelve hundred and sixty-two dollars, and by its false and untruthful representations to appellee, it induced him to accept the sum of four hundred and fifty-three dollars and thirty cents.

Cook, J., delivered the opinion of the court.

Appellee filed his bill of complaint in the chancery court of Warren county against appellant to enforce payment of a balance claimed to be due complainant out of profits on a tontine policy, which it was alleged consisted of "the accumulated surplus in cash to be apportioned to complainant under said contract." It is further averred that complainant was entitled to receive on the completion of his tontine period, as his portion of the accumulated surplus, a sum in excess of twelve hundred and sixty-two dollars and thirty-one cents; that he has no means of knowing the exact amount, but that the exact amount was known to defendant and can be shown by its books, and complainant is entitled "to a full, accurate, and detailed showing from defendant and to have an accounting of 'its said trust and agency;'" that at the completion of his tontine period defendant falsely represented to him that only four hundred and fifty-three dollars and thirty cents was due to him; that complainant, relying on said statement as true, accepted such sum in payment, under protest, being misled and fraudulently induced thereto by defendant, and in ignorance of the true sum due. To this bill of complaint a demurrer was interposed which was overruled, and an appeal was granted to settle the principles of law involved in the case.

We deem it unnecessary to decide whether the bill was for discovery and relief, or simply for an accounting, because in the view taken by us it is immaterial whether the bill be considered the one or the other. It will be

observed that at the expiration of the tontine period the insurance company tendered and paid to appellee an amount which it claimed and represented to be the true amount due under the terms of the contract. Appellee accepted the amount tendered, under protest, believing that it represented what was due him out of the accumulated surplus. Just why he accepted it under protest, when he believed that he was getting all due him under his contract, does not appear.

The right to reopen the settlement had between appellant and appellee and to have an accounting, or discovery, is predicated upon the charge of fraud. The bill does not set out any facts or circumstances which go to make up the alleged fraud, but the court is asked to decree that the defendant was guilty of misrepresentation and fraudulent practices without a single concrete fact being alleged upon which the court could base its decree. The simple charge of fraud or untruthfulness may raise an issue to be settled by the wager of battle, but in a court of equity it is necessary to state something more than the conclusions of the pleader; mere epithets are not sufficient, and the defendant is not required to deny or explain. If, as complainant alleges the payment to him was inequitable and unfair, he must have been in possession of some facts, or was able to relate some circumstances, which would justify the court in reopening the settlement. True, he says he is so informed and believes, and so represents the facts to be; but this, at last, means only that his informer told him merely that he had been defrauded, or put him in possession of some facts leading to this conclusion, and which he should have stated to the court for its consideration and judgment.

This court has clearly stated the rule where fraud is relied on as a basis of relief as follows: "No principle of equity jurisprudence is more firmly established than that, where fraud is relied on as a basis of relief sought from a chancery court, the facts on which the charge of

fraud is predicated must be specifically stated with full definiteness of detail. No general averment of a fraudulent course of business, and no bare statement of a corrupt design on the part of the defendant, is sufficient. The acts themselves which are claimed to be fraudulent must be clearly set out. It must further appear, by definite averment, in what manner the fraudulent acts wrought injury to the complainant. Fraud cannot be inferred, but must be distinctly charged, and with such fullness and precision that a court of chancery would be enabled to grant full and complete relief and redress should the bill of complaint be taken as confessed. A court of equity, from a mere vague and indefinite statement that a certain course of conduct was in pursuance of a fraudulent scheme, will not infer fraud on the part of the defendant, and consequent injury to the complainant." *Weir* v. *Jones*, 84 Miss. 602, 36 South. 533, and cases there cited.

Coming now to the consideration of the other questions involved, we are of the opinion that in the interpretation of this contract the decisions of the New York courts should be followed. This rule the Supreme Court of the United States announced for its guidance in cases involving similar questions as are presented in this case. *Equitable Life* v. *Brown*, 213 U. S. 25, 29 Sup. Ct. 404, 53 L. Ed. 682.

The complainant below also predicated his right to a discovery or accounting upon the theory that the relations between the assured and insurer were of a fiduciary character, and that the insurance company held the accumulated profits as trustee for the policy holders.

The supreme court of New York, in response to a like allegation in a bill involving the construction of a policy similar to the one in the instant case, said: "He claims now to maintain the action and to have the right to an accounting upon the grounds: (1) That the relation between the plaintiff and defendant is not one solely of

contract, but that as to the participation in the profits of this tontine system, that relation is similar to one of trustee and *cestui que trust.* . . . As to the first, we are convinced, after a careful examination of the character of the relations existing between these parties, that it cannot be said that the defendant is in any sense a trustee of any particular fund for the plaintiff, or that it acts as to him and in relation to any such fund in a fiduciary capacity. It has been held that the holder of a policy of insurance even in a mutual company was in no sense a partner of the corporation which issued the policy, and that the relation between the policy holder and the company was one of contract, measured by the terms of the policy." *Uhlman* v. *New York Life,* 109 N. Y. 421, 17 N. E. 363, 4 Am. St. Rep. 482.

The Supreme Court of the United States followed the New York courts, saying: "They lay no foundation for the jurisdiction of a court of equity in such a case, unless it appears that the relation between the policy holder and the defendant is that the latter is the trustee of the former by reason of the trust relation between them resulting from the insurance policy. The complainant's contention, as above stated, that there is such a trust in the fund mentioned, has never been regarded as the law in the state of New York, nor anywhere else so far as any case has been cited on the subject." *Equitable Life* v. *Brown,* 109 U. S. 25, 29 Sup. Ct. 404, 53 L. Ed. 682.

We think these cases settle the question of trusteeship, and will be adopted as the correct interpretation of the contract to be construed in this case.

It is insisted that this court in the case of *Clark* v. *Equitable Society,* 76 Miss. 22, 23 South. 453, has settled the principles of this case in favor of appellee; while appellant contends that the doctrine announced there is unsound and should be overruled should that case again come to this court. It is also said that the Clark case is not this case, to which statement we agree. It was held

in that case the assured was entitled to an accounting
under the allegations of the bill, and it will be noted that
the bill set out specifically and in detail the facts upon
which complainant relied for an accounting. The Clark
case is, however, authority for the position assumed by
appellant here—that the rights of the parties are to be
measured by the terms of the policy. The court in defin-
ing the position of Mrs. Clark said: "She is a creditor,
pure and simple, seeking to enforce the performance by
the appellee of a written contract, and to that end she
asks an accounting and discovery." We do not wish to
recede from the principles announced in the Clark case,
nor do we deem it necessary to modify anything there said
by the court; we only call attention to the clear distinction
between the present case and the case then before the
court.

The bill of complaint failing to set out any facts from
which the court can infer fraud, the demurrer should for
this reason have been sustained. Decree here reversing
the decree of the chancellor, sustaining the demurrer, and
dismissing the bill.

*Decree reversed, and bill dismissed.*